UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
CAROLE DANTUONO,

              Plaintiff,

      -against-

DAVIS VISION, INC. and HEATHER
N. REYNOLDS

             Defendants.
-------------------------------------X

**MEMORANDUM & ORDER**
07-CV-2234 (TCP)(ETB)

APPEARANCES:

For Plaintiff:

Carole Dantuono

              Robert C. Jacovetti
              Frank & Associates, P.C.
              500 Bi-County Boulevard, Suite 112N
              Farmingdale, NY 11735

For Defendants:

Davis Vision Inc., and
Heather N. Reynolds

              Marc S. Wenger
              David Ehrlich
              Jackson Lewis LLP
              58 South Service Road, Suite 410
              Melville, NY 11747

PLATT, District Judge:

    Pending is Defendants' Motion for Summary Judgment. For the reasons discussed below, the Motion is **GRANTED** in part and **DENIED** in part.

## BACKGROUND

    Plaintiff was an employee of Defendant Davis Vision Inc. ("Davis"), beginning in 1998. At that time, she was a full-time Corporate Financial Assistant, working Monday through Friday, 8:30

a.m. to 5:00 p.m. for Chief Financial Officer Lawrence Gabel. In late 2003, Plaintiff became pregnant for the first time, and from May 4, 2004 to July 28, 2004, she was granted leave after giving birth to her first child. Upon returning to work, Plaintiff asked Davis for a schedule accommodation allowing her to work fewer days per week. As a result, her schedule was reduced to Monday through Thursday, 8:00 a.m. to 5:00 p.m. During this time, Plaintiff also began performing some work for Defendant Heather Reynolds.

In 2005, Mr. Gabel determined that he needed a full-time assistant. After discussions with Defendant Reynolds and David Negron (Vice President of Human Resources), Plaintiff was transferred to the position of Assistant to the Contracting and Regulatory Compliance Department where she worked for Defendant Reynolds. Her scheduled remained part-time, Monday through Thursday, 8:30 a.m. to 4:30 p.m. Plaintiff also continued to occasionally assist Mr. Gabel. Plaintiff would use the internet to assist Mr. Gabel, and as authorized, during her downtime.

From February 13–27, 2006, Defendant Reynolds went on medical leave. Prior to going on leave, Defendant Reynolds discussed with Plaintiff the work she wanted completed while away. Plaintiff was given four projects to complete. Upon Defendant Reynolds's return, Plaintiff had not completed two of the projects.

When Defendant Reynolds was informed that two projects were not completed, she fired off an angry email to Plaintiff. Then, because Plaintiff had not completed her tasks, Defendant Reynolds asked Davis's Information-Technology Department to run an internet-tracking report on Plaintiff. The report indicated that during the 5½ days Defendant Reynolds was out, Plaintiff was logged onto

the internet for 12 hours.[1] After receiving the report, Defendant Reynolds met with Senior Vice President Dale Paustian and Vice President Larry Gallagher about her intent to discipline Plaintiff, and how she no longer wanted to work with Plaintiff. Defendant Reynolds then issued Plaintiff a disciplinary notice on March 1, 2006. Plaintiff objected to the amount of internet usage she was charged with. Plaintiff then complained to Mr. Negron—twice—about what she considered Defendant Reynolds's discrimination. Defendant Reynolds asserts that she was unaware of the complaints. Soon thereafter, Plaintiff's job description changed—requiring the she lift up to 10 pounds—an express inclusion that was previously absent from her duties.

In November 2005, Plaintiff alerted Defendants of her attempts to become pregnant with her second child. On February 27, 2006—the day following Defendant Reynolds's return from leave—Plaintiff informed Defendant that she was in fact pregnant with her second child.

After becoming pregnant, Plaintiff's doctor instructed her to refrain from any bending or lifting. Her doctor later amended this instruction, allowing Plaintiff to lift up to 10 pounds. Although Defendant Davis asserts that it accommodated Plaintiff, Plaintiff claims that Defendants disallowed her coworker's offer of help with any lifting Plaintiff had to do. Defendant Reynolds did not want to grant this accommodation because then, she said, everyone would want an accommodation.

On May 24, while handing Plaintiff her payment stub, Defendant Reynolds asserts that she saw Plaintiff on the internet. Defendants posit that Plaintiff continued to use the internet for personal

---

[1] As will be discussed later, this does not mean Plaintiff was actively surfing the internet for 12 hours. It only means that her computer was logged on for 12 hours. The report did not indicate whether Plaintiff was active on the internet, or whether a window was open in the background as Plaintiff was working.

use even after being told to stop. A final warning was issued to Plaintiff on May 24, 2006. In the following days, Defendant Reynolds expressed to Mr. Negron and Mr. Gabel her feelings and decision to fire Plaintiff. Defendants fired Plaintiff on May 31, 2006.

Plaintiff filed her Complaint in this Court on June 1, 2007. In it, she alleges six claims: (1) pregnancy discrimination under the American with Disabilities Act ("ADA"); (2) gender and pregnancy discrimination, based on her "unlawful termination," under Title VII; (3) a hostile work environment under Title VII; (4) gender and pregnancy discrimination under the New York Human Right's Law; (5) retaliation under the New York Human Right's Law; and (6) aiding and abetting discrimination under the New York Human Right's Law.

## DISCUSSION

### A.    Standard for Summary Judgment

A motion for summary judgment may not be granted unless the court determines that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (quoting Fed. R. Civ. P. 56(c)). "Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." Williams v. R.H. Donnelly Corp., 368 F.3d 123 (2d Cir. 2004). The court must resolve all ambiguities and draw all inferences in favor of the non-moving party. Id. at 255; Castle Rock Entm't, Inc. v. Carol Publ'g Group, 150 F.3d 132, 137 (2d Cir. 1998). "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the [specific] pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'

-4-

" Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). If there is any evidence in the record from which a reasonable inference may be drawn in favor of the non-moving party on a material issue of fact summary judgment is improper. Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). "[T]he judge's role in reviewing a motion for summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id.

**B.      Pregnancy is not a Disability Under the ADA**

"The ADA prohibits employers from discriminating 'against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.' " Leahy v. Gap, Inc., No. 07-CV-2008, 2008 WL 2946007, at *4 (E.D.N.Y. July 29, 2008) (quoting 42 U.S.C. § 12112(a)). Employers of disabled persons are "required to make reasonable accommodations for otherwise qualified individuals with disabilities and are prohibited from retaliating against an employee engaged in activities protected under the statute." Leahy, 2008 WL 2946007, at *4 (citing 42 U.S.C. §§ 12112(b)(5)(a), 12203(b)).

Four elements are required to make out a prima facie case under the ADA. Giordano v. City of N.Y., 274 F.3d 740, 747 (2d Cir. 2001). To establish a prima facie case, a plaintiff must prove: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."

Giordano, 274 F.3d at 747. An essential element is thus that the plaintiff is disabled as defined under the ADA. See Leahy, 2008 WL 2946007, at *4 ("An essential element of a claim for failure to accommodate is that the plaintiff be an individual with a "disability" within the meaning of the statute." (citing cases)).

The ADA defines a disability, "with respect to an individual[:] (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). A person is "regarded as having" an impairment where "the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). In determining whether the person is "substantially limited," courts consider "the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact of or the expected long term impact of or resulting from the impairment. . . . For purposes of the ADA, short term, temporary restrictions are not 'substantially limiting' and do not render a person 'disabled.' " Leahy, 2008 WL 2946007, at *4 (quoting Conley v. United Parcel Serv., 88 F. Supp. 2d 16, 19 (E.D.N.Y. 2000) (internal quotation marks omitted). A Judge in the Southern District, discussing the issue in 2008, stated:

> To establish a disability under the ADA, there must be some proof of permanency. See Adams v. Citizens Advise Bureau, 187 F.3d 315, 316-17 (2d Cir. 1999). In other words, the limitation on the claimed major life activity cannot be temporary. Id. (temporary neck, back, and knee injury lasting three and a half months not a disability); Colwell v. Suffolk County Police Dept., 158 F.3d 635, 646 (2d Cir. 1998) (temporary impairment of seven months not substantially

limiting); McNamara v. Tourneau, Inc., 496 F. Supp. 2d 366, 376 (S.D.N.Y. 2007) (injury lasting only eight weeks not a qualifying disability); Williams v. Salvation Army, 108 F. Supp. 2d 303, 312-13 (S.D.N.Y. 2000) (temporary, non-chronic impairments of short duration, with little or no long-term or permanent impact, are usually not disabilities.").

Green v. N.Y. City Health & Hosp. Corp., No. 04-CV-5144, 2008 WL 144828, at *4 (S.D.N.Y. Jan. 15, 2008).

Plaintiff's ADA claim arises out of her pregnancy. (Compl. ¶ 32.) Defendants, however, argue that pregnancy does not constitute a "disability" under the ADA. (Defs.' Mem. L. 6.) They are correct. " 'Every court to consider the question of whether pregnancy in and of itself is a "disability" within the meaning of the ADA has concluded that it is not.' " Green, 2008 WL 144828 at *5 (quoting Minott v. Port Auth. of N.Y. & N.J., 116 F. Supp. 2d 513, 525 (S.D.N.Y. 2000)); see also Conley, 88 F. Supp. 2d at 19 ("short-term, non-chronic impairments with no permanent impact, such as the Plaintiff's miscarriage here, are not considered 'disabilities' under the ADA."); Martinez v. N.B.C., Inc., 49 F. Supp. 2d 305, 309 (S.D.N.Y. 1999) ("Every court to consider the question to date has ruled that 'pregnancy and related medical conditions do not, absent unusual conditions, constitute a [disability] under the ADA.' " (quoting LaCoparra v. Pergament Home Ctrs., Inc., 982 F. Supp. 213, 228 (S.D.N.Y. 1997)). Even the EEOC regulations—entitled to "substantial deference" in construing the ADA—exclude pregnancy as a disability. Martinez, 49 F. Supp. 2d at 308-09 ("EEOC regulations, which are entitled to substantial deference in construing the ADA, explicitly exclude 'conditions, such as pregnancy, that are not the result of a physiological disorder.' " (quoting 29 C.F.R.Pt. 1630, App. § 1630.2(h) (1998)[2])); see also Meritor Sav. Bank, FSB v.

---

[2] This Regulation Appendix remains unchanged today. See 29 C.F.R.Pt. 1630, App. § 1630.2(h) (2009) ("Other conditions, such as pregnancy, that are not the result of a physiological

Vinson, 477 U.S. 57, 65, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986) ("these [EEOC] Guidelines, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." (internal quotation marks and citations omitted)). One judge has even written "[i]t is simply preposterous to contend a woman's body is functioning abnormally because she is lactating." Bond v. Sterling, Inc., 997 F. Supp. 306, 311 (N.D.N.Y. 1998). Only in rare cases—where there are pregnancy complications—has pregnancy been held to be a disability under the ADA. See Minott, 116 F. Supp. 2d at 525 ("courts have held only in extremely rare circumstances that complications arising from pregnancy constitute a disability under the ADA."). There are no allegations of that here.

In Leahy, Judge Hurley (from this District) rejected a plaintiff's argument that "her disability was not her pregnancy but rather her inability to 'perform heavy lifting, climbing ladders and other strenuous movements.' " Leahy, 2008 WL 2946007, at *5. Those are nearly identical symptoms to what Plaintiff complains of here. Judge Hurley held that, as a matter of law, those "claimed limitations were the result of her pregnancy and therefore as temporary as the pregnancy itself." Id. at *5. He went on to allow the plaintiff to amend her complaint if her inability to perform those tasks was permanent, and unrelated to her pregnancy. Id. ("If, in fact, the inability to perform the aforementioned tasks was of a more permanent nature, untethered to Leahy's pregnancy, she may amend her complaint accordingly."). Plaintiff may do the same here and amend if applicable. But her current Claim 1—alleging a violation of the ADA due to pregnancy—is dismissed.

## C.    There are Material Issues of Fact Concerning Plaintiff's Title VII Claims

Plaintiff alleges two Title VII Claims—sex and pregnancy discrimination, and a hostile work

---

disorder are also not impairments.").

environment. (Compl. ¶¶ 36-47.) For the reasons discussed below, summary judgment on these Claims is **DENIED**.

### 1. Title VII Generally

Title VII's purpose is to ensure equal employment opportunities for all, and to eliminate discriminatory practices and devices. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) ("The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens."). This Act, however, was not meant as a job-guarantee for all. McDonnell Douglas, 411 U.S. at 800 ("Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications." (quoting Griggs v. Duke Power Co., 401 U.S. 424, 430, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971))). Further, the Act does not guarantee a job simply because a person is a member of a certain group. McDonnell Douglas, 411 U.S. at 800 ("the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group." (quoting Griggs, 401 U.S. at 430-31)). All Congress did was to proscribe invidious preferences, and barriers to employment, based upon impermissible classifications. McDonnell Douglas, 411 U.S. at 800 ("Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." (quoting Griggs, 401 U.S. at 431))

Title-VII-disparate-treatment-discrimination claims must undergo a burden shifting analysis,

first outlined in McDonnell Douglas. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

First, "[t]he complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of [] discrimination." McDonnell Douglas, 411 U.S. at 802. Next, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id. Finally, if such reason is offered, the burden shifts back to the complainant to prove that discrimination was the true reason for the employment action and not pretext. Id. at 804 (the complainant must "be afforded a fair opportunity to show that [the employer's] stated reason for [complainant's] rejection was in fact pretext."); see also Graham, 230 F.3d at 38 ("Under the burden-shifting analysis . . ., a plaintiff first must establish a prima facie case of discrimination based on race. If he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's dismissal. If such a reason is proffered, the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action." (citations omitted)).

To meet her burden of production in the above analysis for a prima facie case, Plaintiff must prove four elements, that she: "(1) is a member of a protected class; (2) was performing [her] duties satisfactorily; (3) was discharged; and that (4) [her] discharge occurred under circumstances giving rise to an inference of discrimination on the basis of [her] membership in the protected class." Graham, 230 F.3d at 38. The burden to prove a prima facie case on summary judgment is a low one. Id. ("The burden a plaintiff, alleging that he was discriminated against by his employer, carries to survive a summary judgment motion at the prima facie stage is a minimal one."). At the summary-judgment stage, for the second prong (satisfactory performance of duties), all that needs to be shown was that the plaintiff had the necessary skills to perform the job. Slattery v. Swiss Reinsurance Am.

Corp., 248 F.3d 87, 92 (2d Cir. 2001) ("The qualification prong must not, however, be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his prima facie case, the employer's proffer of a legitimate, non-discriminatory basis for its decision. . . . [T]he qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he 'possesses the basic skills necessary for performance of [the] job.' ").

## 2. Plaintiff's Sex- and Pregnancy-Discrimination Claims Can Proceed

Plaintiff alleges that she was discriminated against on the basis of her gender and her pregnancy in violation of Title VII, stemming from her alleged wrongful termination. (Compl. ¶ 37.) Defendants concede, for the purposes of this motion, that Plaintiff is a member of a protected class, possessed the basic qualifications of her position, and was discharged. (Id. at 8.) They dispute, however, that Plaintiff was discharged for a discriminatory reason. (Id. at 8-9.) Rather, Defendants argue, Plaintiff's needs (due to her pregnancy) were accommodated, her work-load remained constant, she was given prior warnings regarding her internet usage, Plaintiff herself does not even believe she was fired because of her pregnancy, and, in fact, her firing was not motivated by her pregnancy. (Id. at 9-12.) Further, Defendants argue that they have articulated a legitimate non-discriminatory reason for Plaintiff's firing—her improper internet usage. (Id. at 13-14.) Finally, Defendants posit that Plaintiff cannot prove that their reason behind the firing was pretext. (Id. at 14-15.) Because material issues of fact exist, summary judgment on this claim is inappropriate.

Since Defendants concedes three of the four elements for the purposes of this Motion, the only issue is whether Plaintiff was discharged because of her gender or pregnancy. At this early summary-judgment stage, Plaintiff's burden is minimal. And she has met that burden. Plaintiff

asserts that she repeatedly discussed her intentions and attempts to become pregnant with her second child in November 2005. (Pl.'s Mem. L. 2, 16.) This was prior to Defendant Reynolds's decision to fire Plaintiff. (Pl.'s Mem. L. 16.) Plaintiff has alleged a prima facie case.

Courts have held that, as a matter of law, a plaintiff's allegations that she notified her employer that she was trying to become pregnant, and was fired as a result, were sufficient to state Title VII claims. See, e.g., Poucher v. Automatic Data Processing, Inc., No. 98-CV-2669, 2000 WL 193619, at *1, 4 (N.D. Tex. Feb. 17, 2000) ("Poucher alleges that, in violation of 42 U.S.C. § 2000e(k), ADP terminated her employment after her supervisors learned that she intended to become pregnant. . . . [T]his Court is satisfied that the intent to become pregnant falls within the scope of protections afforded by Title VII."); Cleese v. Hewlett-Packard Co., 911 F. Supp. 1312, 1315 (D. Or. 1995) (plaintiff's Title VII suit was allowed to proceed on allegations that she informed Hewlett-Packard that she was trying to become pregnant and was then fired); Pacourek v. Inland Steel Co., 858 F. Supp. 1393, 1400-02 (N.D. Ill. 1994) (the court held that the Pregnancy Discrimination Act—a 1978 amendment to Title VII—covered both intended and potential pregnancies, and that plaintiff alerted her employer that she was seeking an experimental treatment due to her inability to become pregnant presented a cognizable claim). Defendants, however, rely on Rinsler v. Sony Pictures Entm't, Inc.,[3] arguing that Plaintiff is relying solely on temporal proximity to establish an inference of discrimination. (Defs.' Reply Mem. L. 7.) In Rinsler, the plaintiff found out she was pregnant in November, and her boss discovered this one month later. Rinsler, 2003 WL 22015434, at *2. One month after plaintiff's pregnancy was disclosed, she was alerted that she would no longer remain at her position. Id. She still remained at her job, however,

---

[3] No. 02-CV-4096, 2003 WL 22015434, at *1 (S.D.N.Y. Aug. 25, 2003).

until a replacement could be found. Id. Then, in April, plaintiff was transferred and her salary reduced. Id. This position change also relocated her to a basement office—requiring that she repeatedly ascend and descend a long flight of stairs while six-months pregnant. Id. Soon after her return from maternity leave, plaintiff—along with all others employed in the same position—were laid off. Id. at *3. The Southern District held that there was no circumstantial evidence of discrimination by way of "suspicious timing" because her transfer occurred over three months after defendants learned of her pregnancy. Id. at *6. There, however, the plaintiff's entire case rested on the timing of her pregnancy and firing. Id. ("Rinsler's claim of pregnancy discrimination is based almost exclusively on her allegation that she was demoted soon after she announced that she was pregnant."). The Southern District noted that, in that district, temporal proximity was sufficient to raise an inference of discrimination where one month had elapsed between the announcement and adverse action. Id. at *6 n.25. But again, the relevant fact in that case was that the entire case rested solely on temporal proximity. Id. at *6 ("The timing of these events is not 'suspicious' enough to alone create an inference of discrimination." (emphasis supplied)).

Plaintiff's case here—while incorporating temporal proximity to show that Defendants were aware of her intent to become pregnant prior to the adverse action—does not rely solely on temporal proximity. Rinsler is thus inapposite. Here, Plaintiff alleges that after she announced her pregnancy, her job description changed to require heavy lifting and bending[4], (Compl. ¶ 25); she was subjected to harassment and disparate treatment—including additional work and a lack of direct

---

[4] The timing of the job-description change is noticeable. Defendants have not sufficiently explained why—after Plaintiff's pregnancy and lifting/bending limits—they felt compelled to insert this overt lifting requirement. This is especially questionable in light of Defendant Reynolds's denial of Plaintiff's coworker's offer to help her with any lifting. This demonstrates a material issue of fact.

communication, negative evaluations, a lack of proper instruction, negative comments made to her supervisors, and belittlement in the presence of coworkers, (Id. ¶ 26); Human Resources took no steps to end the discrimination following Plaintiff's complaints; and Defendants tried to coerce her into resigning her position, (Id. ¶ 29). Further, when Plaintiff's coworker offered to help her with any lifting, Defendant Reynolds disallowed this on the basis that if Plaintiff were accommodated, everybody would request accommodations. (Pl.'s Mem. L. 9; Dantuono Aff. ¶ 25.) Moreover, Plaintiff has rebutted—for the purposes of this motion—Defendants' non-discriminatory reasoning for firing her—her internet usage. Defendant Reynolds based her conclusion that Plaintiff was on the internet too much in large part on the internet-usage reports she received. (See Defs.' R. 56.1 Stmt ¶¶ 31-32.) But as admitted by Defendants' employee, these records were woefully incomplete—it is impossible to tell for what purpose the internet was being used, and whether Plaintiff was actively using the internet, or whether there was just a window open in the background. (Pl.'s Ex. C. 141:9-25.) While Defendants dispute these facts—this demonstrates issues of fact for trial. Summary judgment is thus **DENIED** on this claim.

### 3. There are Material Issues of Fact Concerning Plaintiff's Hostile-Work-Environment Allegations

Besides disparate-treatment discrimination leading to a direct economic injury (e.g., being fired), a defendant can violate Title VII by maintaining a hostile work environment. Meritor Sav. Bank, 477 U.S. at 66 ("a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment."). EEOC guidelines confirm that harassment leading to non-economic injury can violate Title VII. Id. at 65 ("The EEOC Guidelines fully support the view that harassment leading to noneconomic injury can violate Title

VII. . . . In concluding that so-called 'hostile environment' ( i.e., non quid pro quo) harassment violates Title VII, the EEOC drew upon a substantial body of judicial decisions and EEOC precedent holding that Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." (citations omitted)). And a hostile work environment can arise from sexual harassment. Id. at 66 ("Nothing in Title VII suggests that a hostile environment based on discriminatory sexual harassment should not be likewise prohibited. "). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " Id. at 67.

"A hostile work environment claim requires a showing (1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (citing Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (internal citations and quotation marks omitted)). The hostile-work-environment test has both objective and subjective elements: "the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." Alfano, 294 F.3d at 374 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). And the misconduct must be continuous and concerted, not merely episodic. Alfano, 294 F.3d at 374 ("As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' " (citing Perry, 115 F.3d at 149)). Isolated acts will not be enough unless they are sufficiently severe. Alfano, 294 F.3d at 374 ("Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness. . . . [I]it

is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace" (citing <u>Brennan v. Metro. Opera Ass'n</u>, 192 F.3d 310, 318 (2d Cir. 1999))). "Conduct that is 'merely offensive, unprofessional or childish is not discriminatory conduct proscribed by Title VII.' " <u>Trinidad v. N.Y. City Dep't of Corr.</u>, 423 F. Supp. 2d 151, 164 (S.D.N.Y. 2006) (quoting <u>Cosgrove v. Fed. Home Loan Bank of N.Y.</u>, Nos. 90-CV-6455, 92-CV-4225, 1999 WL 163218, at *20 (S.D.N.Y. Mar. 23, 1999)). "In short, a plaintiff alleging a hostile work environment 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted" to have altered the conditions of her working environment.' " <u>Alfano</u>, 294 F.3d at 374 (quoting <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 570 (2d Cir. 2000)). In making this determination, courts consider the totality of the circumstances, and the incidents' severity, frequency, and degree of abuse. <u>Alfano</u>, 294 F.3d at 374 ("To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." (citation omitted); <u>see</u> <u>also</u> <u>Harris</u>, 510 U.S. at 21 ("whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.").

Plaintiff's allegations include that Defendant Reynolds: was "snippy" and "short" with her; "talked down" to her and "scolded" her; "bad mouthed" her to other executives; communicated through email rather than in-person; and banished Plaintiff from her office when speaking with others. (Def's R. 56.1 Stmt. ¶¶ 81-83; Pl.'s R. 56.1 Stmt. ¶¶ 81-83.) And Plaintiff alleges that this

all began only after she announced her pregnancy intentions. (Compl. ¶ 25.) Although these allegations are about the bare minimum, the Court will allow this claim to go forward. Plaintiff's issues only arose after she announced her pregnancy. And although there are no allegations that Defendants referred specifically to her pregnancy, "[f]acially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim . . . ." <u>Rodriguez v. City of N.Y.</u>, 644 F. Supp. 2d 168, 190 (E.D.N.Y. 2008) (quoting <u>Alfano</u>, 294 F.3d at 378). While the Court expresses its lack of confidence on Plaintiff's likelihood of ultimately prevailing on this Claim, there are enough material issues of fact so that summary judgment is **DENIED**.

## D.     The New York Claims can Proceed

In addition to her federal claims, Plaintiff also asserts three state-law claims under the New York Human Right's Law ("HRL"). (<u>See</u> Compl. ¶¶ 41-61.) New York's HRL is located within Article 15 of the state's Executive Laws. <u>See</u> N.Y. Exec. Law. §§ 290-301 (McKinney 2009). Section 296(1)(a) outlaws <u>employers</u> from engaging in unlawful discriminatory practice. N.Y. Exec. Law. §§ 296(1)(a) (McKinney 2009) (emphasis supplied). Other subsections of § 296 assign liability to employment agencies, § 296 (1)(b); labor organizations, § 296(1)(c); joint labor-management committees, § 296(1-a); and owners, lessees, proprietors, managers, superintendents, agents, or employees of any place of public accommodation, resort, or amusement, § 296(2)(a). Moreover, § 296(1)(g) prohibits "an employer to compel an employee who is pregnant to take a leave of absence, unless the employee is prevented by such pregnancy from performing the activities involved in the job or occupation in a reasonable manner." N.Y. Exec. Law. §§ 296(1)(g) (McKinney 2009).

-17-

1. **There are Material Issues of Fact as to Whether Defendant Reynolds is an "Employer" Under New York's Human Right's Law**

Plaintiff's Fourth Claim alleges gender and pregnancy discrimination under Executive Law § 296(a)(1). (Compl. ¶¶ 48-52.) She claims that, as a result of Defendants' course of conduct against her, she suffered a "substantial loss" of earnings and benefits. (Id. ¶¶ 49-50.) Defendants do not seek summary judgment on this claim for Defendant Davis, only Defendant Reynolds. (See Defs.' Mem. L. 23-24.) And they only argue that this Claim must be dismissed as to Defendant Reynolds because she is not an "employer" under § 296(a)(1)—a liability requirement. (Id.) Because the test for who is an "employer" under § 296(a)(1) is a fact-intensive balancing inquiry, there are material issues of fact concerning whether Defendant Reynolds is an "employer."

Only employers can be held liable for discrimination under § 296(1)(a); "employees" cannot be held liable unless they have an ownership interest, or certain powers within the company (thus making them "employers" under the HRL). See Patrowich v. Chem. Bank, 63 N.Y.2d 541, 542, 473 N.E.2d 11, 483 N.Y.S.2d 659 (1984) ("A corporate employee, though he has a title as an officer and is the manager or supervisor of a corporate division, is not individually subject to suit with respect to discrimination based on age or sex under New York's Human Rights Law (Executive Law, art. 15) . . . if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." (emphasis supplied)); Foley v. Mobil Chem. Co., 170 Misc.2d 1, 3, 647 N.Y.S.2d 374 (N.Y. Sup. Ct. 1996) (" 'employer[s]' are the proper subject of SHRL claims of discrimination in employment under N.Y. Executive Law § 296(1)(a)."). The HRL's "employer" definition only relates to the number of employees, and does not guide the Court as per the required standing within an organization. See N.Y. Exec. Law § 292(5) (McKinney 2009) ("The term

'employer' does not include any employer with fewer than four persons in his employ.")

With related statutes, New York looks to the "economic realities" in determining who is an employer, and is thus subject to liability. See Patrowich, 63 N.Y.2d at 543-44 (" 'economic reality' governs who may be sued under both statutes [New York Labor Law and Federal Equal Pay Act] . . . .."). New York courts have also applied the "economic realities" test to the HRL. See Foley, 170 Misc.2d at 3 ("the Court of Appeals opined in Patrowich . . . that the statutory definition of an employer [in the HRL] 'provides no clue to whether individual employees of a corporate employer may be sued under its provisions,' and held 'that "economic reality" governs who may be sued.' " (citations omitted)).

Here, under the economic-realities test, there are issues of fact as to whether Defendant Reynolds is an "employer" under the HRL and can be held liable for violating § 296(1)(a). Courts have specified four factors to look for under the "economic realities" test. Under this test, the four factors are: "whether the defendant (1) had the power to hire and fire employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." Heinemann v. Howe & Rusling, 260 F. Supp. 2d 592, 598 (W.D.N.Y. 2003). No one factor is determinative—all four must be balanced. Id. at 598 ("No single factor is dispositive, for 'economic reality is based on all the circumstances.' " (quoting Herman v. RSR Sec. Servs., Ltd., 172 F.3d 132, 139 (2d Cir. 1999)).

Here, there is clearly enough evidence at least to overcome Defendants' motion for summary judgment on the "employer" issue. Defendant Reynolds admits that the decision to fire Plaintiff was her decision. (See Defs.' R. 56.1 Stmt. ¶ 75 ("On either May 25, 2006 or May 26, 2006, Ms. Reynolds explained to Mr. Negron [V.P. of Human Resources] and Mr. Gabel the situation with

-19-

Plaintiff and informed them of _her_ decision to discharge Plaintiff." (emphasis supplied) (citing Reynolds Aff. ¶ 39))). Further, she supervised and controlled Plaintiff's schedule and conditions of employment. (See, e.g., Defs.' R. 56.1 Stmt. ¶ 21 ("Plaintiff was 'happy' to be moving . . . under Ms. Reynolds' supervision . . ."); ¶ 27 ("Ms. Reynolds spoke with Plaintiff about the work _she wanted_ Plaintiff to perform . . . ." (emphasis supplied)); ¶ 31 (Defendant Reynolds sought an internet usage report on Plaintiff to determine the amount of time spent surfing the web); ¶ 35 ("Ms. Reynolds . . . decided to issue Plaintiff a disciplinary notice . . . ."); ¶ 46 (summarizing Defendant Reynolds's supervision and control over Plaintiff); Reynolds Aff. ¶ 16 ("_I_ discussed with Plaintiff the tasks _I_ wanted her to complete . . . _I_ assigned her four projects . . . ." (emphasis supplied)); ¶ 38 ("_I_ had no choice but to discharge her." (emphasis supplied)); ¶ 39 (Defendant Reynolds met with others "to inform them of _my_ decision to discharge Plaintiff. (emphasis supplied)); ¶ 42 ("_My_ decision to terminate Plaintiff's employment . . . ." (emphasis supplied))). Although Defendant Reynolds asserts that she has no ownership interest in Davis, (Reynolds Aff. ¶ 3), that alone is not determinative. The other factors must be considered in conjunction with ownership. Based on the foregoing, there are issues of fact as to whether—under the fact-intensive economic-realities test—Defendant Reynolds was an "employer" under HRL § 296(1)(a). Summary judgment on this issue is thus **DENIED**.

## 2.    Plaintiff's HRL Retaliation Claim can Proceed

In her Fifth Claim, Plaintiff alleges that Defendants retaliated against her, in violation of the HRL, because she complained about Defendant Reynolds's alleged pregnancy-discrimination. (Compl. ¶¶ 53-57.) Plaintiff twice complained about Reynolds's alleged discrimination to Defendant Davis's Vice President of Human Resources. (Pl.'s Mem. L. 17.) Within that same month, Plaintiff received another disciplinary notice, and was fired. (Id.)

Retaliation claims under the HRL require the same burden of proof as Title VII. See Zveiter v. Brazilian Nat. Superintendency of Merch. Marine, 833 F. Supp. 1089, 1095 (S.D.N.Y. 1993) ("This law [ N.Y. Executive Law § 296] is virtually identical to its federal counterpart, 42 U.S.C. § 2000e-2 et seq., and consequently the federal standards for actionable sexual harassment are used in determining claims brought under the New York Human Rights Law."). To establish a prima facie case of retaliation under the HRL, a plaintiff must show: (1) participation in an activity protected under the anti-discrimination statute; (2) the employer was aware of the protected activities; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. Mack v. Otis Elevator Co., 326 F.3d 116, 129 (2d Cir. 2003) (quoting Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000) (citation omitted)). "A causal connection can be established directly through evidence of retaliatory animus or 'indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct.' " Murphy v. Bd. of Educ. of Rochester City Sch. Dist., 273 F. Supp. 2d 292, 321 (W.D.N.Y. 2003) (quoting Gordon, 232 F.3d at 117). And, like the disparate-treatment-Title-VII Claim above, the same burden-shifting approach is used. Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991) ("to make out a prima facie case of retaliation, a plaintiff must show participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action. . . . Once a prima facie case is made, the burden of production 'shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its actions.' Finally, should the defendant meet the burden of coming forward with a permissible reason for its actions, the plaintiff

must then show that the reasons advanced were pretextual." (citations omitted)).

Here, Plaintiff participated in a protected activity when she complained—twice—about Defendant Reynolds's actions and treatment towards her. (Pl.'s Mem. L. 17.) Within a month, Defendant Reynolds issued Plaintiff a new job description expressly requiring her to lift up to ten pounds. (Id.; Pl's Ex. O.) And Defendants knew that Plaintiff's doctor had advised against lifting or bending over. (Defs.' Mem. L. 6.) Although the connection is tenuous, due to the proximity between the complaints and the updated job description requiring lifting, it can be inferred that Defendants were retaliating against Plaintiff. Moreover, the parties disagree on whether Defendant Reynolds knew of Plaintiff's complaints. And since Defendants' internet-usage explanation, for the same reasons discussed above, could be pretextual, there are issues of fact and credibility questions on this point. The Court will thus deny summary judgment on this Claim.

### 3. The Aiding and Abetting Claims do not Require the Defendant be an "Employer" and can Advance

Plaintiff's Sixth Claim alleges that Defendant Reynolds aided and abetted Davis's discriminatory practices in violation of N.Y. Exec. Law § 296(6). (Compl. ¶¶ 58-61.) Defendants argue that Ms. Reynolds cannot be held liable as an aider and abettor because, like with N.Y. Exec. Law § 296(1), only employers can be held liable as aiders and abettors under § 296(6). (Defs.' Mem. L. 24.) Notwithstanding the Court's above determination that there are material issues of fact as to whether Defendant Reynolds is an "employer" under the HRL, the aiding and abetting section of the HRL—§ 296(6)—does not contain an "employer" requirement.

In Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995), the Second Circuit held that under the "aiding and abetting" language of § 296(6), "a defendant who actually participates in the

conduct giving rise to a discrimination claim may be held personally liable under the [NY]HRL."

In essence, the court in Tomka did not find an employer requirement; any participant in the

discriminatory conduct faces liability. But the New York state courts have

> not uniformly accepted the Second Circuit's interpretation of state
> law in Tomka, and the two New York Appellate Divisions located
> within the Southern District of New York have in fact reached
> divergent conclusions on this issue. Compare Steadman v. Sinclair,
> 223 A.D.2d 392, 393, 636 N.Y.S.2d 325 (1st Dep't 1996) (citing,
> inter alia, Tomka for the proposition that " 'an individual may be held
> liable for aiding discriminatory conduct' " under the NYHRL
> (citation omitted)), with Trovato v. Air Express Int'l, 238 A.D.2d
> 333, 334, 655 N.Y.S.2d 656 (2d Dep't 1997), (acknowledging the
> contrary conclusions of Tomka and Steadman, but concluding that
> "[t]o find a coemployee liable as an aider and abettor would ignore
> the statutory and legal authority limiting the parties who may be sued
> for employment discrimination.").

King v. Town of Wallkill, 302 F. Supp. 2d 279, 296 (S.D.N.Y. 2004). This state-court confusion

has led to several federal courts declining supplemental jurisdiction over HRL claims.[5] King, 302

F. Supp. 2d at 296 ("The resulting confusion has caused several district courts to decline to exercise

their supplemental jurisdiction over a plaintiff's NYHRL claims." (citing cases)). Most of the

federal courts in New York, however, have continued to follow Tomka. See King, 302 F. Supp. 2d

at 296 ("Nevertheless, the majority of the other federal district courts in New York considering the

issue have elected to follow the lead of the Second Circuit in Tomka and apply its rule of 'actual

participation' to hold individual defendants personally liable under the NYHRL for discriminatory

---

[5] The Court declines to follow the holding of Trovato, where the Appellate Division,
Second Department came to the opposite conclusion of Tomka and held that "[t]o find a
coemployee liable as an aider and abettor would ignore the statutory and legal authority limiting
the parties who may be sued for employment discrimination." 238 A.D.2d at 334. It is the
decisions of the Second Circuit that are binding on this Court, not those of the Second
Department.

conduct via § 296(6)." (citing cases)). This Court agrees with the court in King, as well as Judge

Young from this District (both holding that district courts should follow Tomka), and will follow

Tomka. Even though that decision has been criticized, it is binding on this court. See Perks v. Town

of Huntington, 251 F. Supp. 2d 1143, 1160 (E.D.N.Y. 2003) ("Although this ruling [in Tomka] has

been criticized, it is binding upon this Court . . . ."); see also King, 302 F. Supp. 2d at 296 ("although

the Second Circuit's ruling in Tomka 'has been criticized, it is binding upon this Court.' " (citing

Perks, 251 F. Supp. 2d at 1160)); Petrosky v. N.Y. State Dep't of Motor Vehicles, 72 F. Supp. 2d

39, 65 (N.D.N.Y. 1999) (holding that the Second Circuit is the most important precedential authority

to the district courts, the majority of federal courts have followed Tomka, and since the state courts

are divided on the issue, there is no basis to determine the case was improperly decided).

　　Furthermore, unlike other sections of the HRL, § 296(6) does not textually limit itself to

employers—it states "any person" can be liable for violations. See N.Y. Exec. Law § 296(6)

(McKinney 2009) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite,

compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

(emphasis supplied)); Spilkevitz v. Chase Inv. Servs. Corp., No. 08-CV-3407, 2009 WL 2762451,

at *6 (E.D.N.Y. 2009) (noting that unlike other sections of the HRL that explicitly limit themselves

to employers, "Section 296(6) of the NYSHRL provides that it shall be an unlawful discriminatory

practice 'for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden

under this article, or attempt to do so.' " (quoting N.Y. Exec. Law § 296(6))). Thus,

individuals—such as Defendant Reynolds—can be held liable as an aider and abettor under the HRL.

　　The question still remains whether there are any issues of material fact on this claim. "To

aid and abet means to assist the perpetrator of the [civil violation] while sharing in the requisite []

intent.  <u>United States v. Martinez</u>, 555 F.2d 1269, 1272 (5th Cir. 1977).  Construing a similarly-worded statute, the District of Connecticut defined "aiding and abetting" as "contemplat[ing] liability towards a party who in some way helps or compels another to act in a discriminatory manner." <u>Wasik v. Stevens Lincoln-Mercury, Inc.</u>, No. 98-CV-1083, 2000 WL 306048, at *7 (D. Conn. March 20, 2000).  Because there are material issues of fact concerning whether Defendant Reynolds was a primary violator of the HRL, there are likewise material issues of fact as to whether she was an aider and abettor.  She has admitted to being the driving force behind Plaintiff's firing.  (<u>See</u> Defs.' R.56 Stmt. ¶ 75 ("On either May 25, 2006 or May 26, 2006, Ms. Reynolds explained to Mr. Negron [V.P. of Human Resources] and Mr. Gabel the situation with Plaintiff and informed therm of <u>her decision</u> to discharge Plaintiff." (emphasis supplied) (citing Reynolds Aff. ¶ 39))).  Further, she supervised and controlled Plaintiff's schedule and conditions of employment. (<u>See, e.g.</u>, Defs.' R.56 Stmt. ¶ 21 ("Plaintiff was 'happy' to be moving . . . under Ms. Reynolds' supervision . . ."); ¶ 27 ("Ms. Reynolds spoke with Plaintiff about the work she wanted Plaintiff to perform . . . ."); ¶ 31 (Defendant Reynolds sought an internet usage report on Plaintiff to determine the amount of time spent surfing the web); ¶ 35 ("Ms. Reynolds . . . decided to issue Plaintiff a disciplinary notice . . . ."); ¶ 46 (summarizing Defendant Reynolds's supervision and control over Plaintiff); Reynolds Aff. ¶ 16 ("I discussed with Plaintiff the tasks I wanted her to complete . . . I assigned her four projects . . . .); ¶ 38 ("<u>I</u> had no choice but to discharge her." (emphasis supplied)); ¶ 39 (Defendant Reynolds met with others "to inform them of <u>my</u> decision to discharge Plaintiff. (emphasis supplied)); ¶ 42 (<u>My</u> decision to terminate Plaintiff's employment . . . ." (emphasis supplied))).  And if that firing is found to be discriminatory, Defendant Reynolds may be found to have assisted Defendant Davis, while possessing the required intent.  There are thus material issues of fact, and summary judgment

-25-

on this Claim is **DENIED**.

## CONCLUSION

For the reasons set forth above, Defendants' motion is **GRANTED** in part, and **DENIED**

in part.

SO ORDERED.

_____

Thomas C. Platt, U.S.D.J.

Dated:        Central Islip, New York
                December 2 , 2009